## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:  ) | |
| ) | Case No.:  06-20224 JKF |
| AIRWAY INDUSTRIES, INC.,  ) | |
| ) | Chapter 11 |
| Debtor.  ) | |
| ) | |
| OFFICIAL COMMITTEE OF  ) | |
| UNSECURED CREDITORS OF  ) | |
| AIRWAY INDUSTRIES, INC.,  ) | |
| ) | |
| Plaintiff,  ) | Adv. Pro. No.: 06-_____ |
| v.  ) | |
| ) | |
| CERBERUS PARTNERS, L.P.,  ) | |
| CERBERUS CAPITAL MANAGEMENT,  ) | |
| L.P., MADELEINE L.L.C., STRATEGIC  ) | |
| SOURCES SERVICES, LLC, ROBERT  ) | |
| DAVENPORT, J. RICHARD ABRAHAM,  ) | |
| RAY WECHSLER, GEORGE HAMILTON,  ) | |
| STEVEN MAYER, JOHN DUDASH,  ) | |
| WILLIAM BERRY, and  ) | |
| GRAZYNA KUROWSKA,  ) | |
| ) | |
| Defendants.  ) | |

### COMPLAINT

The Official Committee of Unsecured Creditors ("Committee") of Airway Industries, Inc.

("Airway" or the "Debtor"), by its undersigned counsel, for its Complaint alleges on knowledge

as to itself and on information and belief as to all other matters as follows:

### Preliminary Statement

1.     This is an action by which the Committee seeks to redress a series of insider

transactions and occurrences that resulted in injury to Airway's creditors and estate.

NYC/269552.9

2.     The Defendants comprise a group of Airway insiders directed and controlled by Cerberus (defined below).  The Defendants include former Officers and Directors of Airway as well as Strategic Sources Services, LLC, an entity controlled by a former Director.

3.     Through its acquisition of Airway stock in 1998, Cerberus obtained majority control.  Through its control over Airway and its Board, Cerberus caused Airway's Officers and Directors to take unfair and harmful actions to advance Cerberus' interests, while compromising, prejudicing and adversely affecting the interests of Airway and its creditors.

4.     The Defendants caused harm to Airway and its creditors.  The Defendants saddled Airway with additional debts that the Defendants knew or should have known would be beyond Airway's ability to pay as such debts matured.  The Defendants also depleted Airway's cash reserves by transferring at least $9.5 million to Cerberus.  By causing the transfers to Cerberus, the Defendants left Airway with insufficient cash and unreasonably small capital for Airway's needs.

5.     Having caused Airway's insolvency and financial crisis, the Defendants then compounded Airway's problems.  The Defendants caused Airway to embark on a patently insufficient effort to market Airway's assets.  The Defendants failed to retain investment or merchant banking advice.  The Defendants failed to conduct an asset appraisal.  The Defendants' marketing efforts were limited to calling certain competitors in order to gauge interest in purchasing Airway's assets.

6.     Moreover, the Defendants unreasonably delayed seeking bankruptcy protection in order to bolster Cerberus' position at the expense of Airway's creditors and the estate.  The Defendants unreasonably delayed filing a bankruptcy petition for more than six years.  During that time, Airway was insolvent.  At the beginning of the period of insolvency, the estimated fair

value of Airway's assets were close enough to its liabilities that Airway's creditors would have recovered almost all of the debts owed.  As the Defendants improperly waited, Airway's debts increased and Cerberus' alleged debt interest rose even higher.

7.      Meanwhile, the Defendants completed insider transactions with SSS that featured transfers from Airway to SSS of more than $3.3 million.  Airway received no value in exchange for the $3.3 million.

8.      All of Airway's Directors were affiliated with either Cerberus or SSS.  By conveying more than $12 million to Cerberus and SSS without obtaining value in return, the Defendants exacerbated Airway's dire financial condition.

9.      Even after filing the Petition, the Defendants caused further damage to Airway's creditors and deepened Airway's insolvency by improperly confining the marketing and sale of Airway's assets to a single purchaser, Travelpro International, Inc. ("Travelpro").  After the Defendants identified Travelpro, they failed to take reasonable steps to optimize the auction.

10.     The Defendants manufactured an "emergency" by waiting to file the Petition until less than 45 days before a major industry trade show.  The Defendants then insisted that the Court conduct an auction within a matter of days, thereby ensuring that Travelpro, the stalking horse bidder, would emerge as the winning bidder because other entities lost the opportunity to perform due diligence on Airway's assets.  The Defendants went so far as to instruct one interested and qualified bidder, Badanco, not to attend the auction.

11.     These actions were taken at the insistence and direction of Cerberus, which realized that its secured interest was limited to its "Subordinated" interest – amounting to less than $13 million – due to a failure to file a continuation statement for the "Senior" debt. Cerberus therefore had little incentive to maximize the price of the assets.

3

12.    Cerberus ensured that Airway's management's interests were aligned with Cerberus' interests by entering into bonus agreements whereby Airway's Officers' bonus payments were tied to amounts received *by Cerberus*, not to the amounts received *by Airway*.

13.    The conduct at issue creates liability for fraudulent transfers under Pennsylvania law and the Bankruptcy Code, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, abuse of control, and deepening insolvency, and warrants equitable subordination and recharacterization of Defendants' claims.

## Jurisdiction And Venue

14.    This adversary proceeding is brought pursuant to Rule 7001(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Sections 105, 544 and 551 of title 11 of the United States Code ("Bankruptcy Code").  This Court has jurisdiction over the proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.  This proceeding arises under and otherwise relates to a case under the Bankruptcy Code, and pursuant to Section 157(b)(2) of title 28 of the United States Code, this is a core proceeding.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).  This proceeding arises and relates to a case under the Bankruptcy Code pending in this District.

## Parties

16.    Plaintiff is the Official Committee of Unsecured Creditors appointed in the Debtor's Chapter 11 bankruptcy case.

17.    Defendant Cerberus Partners, L.P. ("Cerberus Partners") is a limited partnership organized, upon information and belief, under the law of Delaware, and having its registered place of business at 450 Park Avenue, New York, New York 10022.

18.     Defendant Cerberus Capital Management, L.P. ("Cerberus Capital") is a limited partnership organized, upon information and belief, under the law of Delaware, and having its registered place of business at 450 Park Avenue, New York, New York 10022.

19.     Defendant Madeleine L.L.C. ("Madeleine" and, together with Cerberus Partners and Cerberus Capital, "Cerberus") is a limited liability company organized, upon information and belief, under the law of Delaware, and having its registered place of business listed at 299 Park Avenue, 24th Floor, New York, New York 10171 and is now located at 450 Park Avenue, New York, New York 10022.

20.     Cerberus holds the entirety of the Prepetition Senior Indebtedness[1] and the DIP Facility, as well as the majority of the Prepetition Subordinated Indebtedness.

21.     Defendant Strategic Sourcing Services, LLC a/k/a Strategic Sourcing Solutions, LLC ("Strategic Services") is a limited liability company organized, upon information and belief, under the law of Pennsylvania, and having its registered place of business at 85 Quail Hill Ln., Pittsburgh, PA 15238 and doing business at 506 South Main Street, Suite 2104, Zelienople, PA 16063.

22.     Defendant Strategic Sourcing Solutions, LLC a/k/a Strategic Sourcing Services, LLC ("Strategic Solutions") is a limited liability company organized, upon information and belief, under the law of Pennsylvania, and doing business at 506 South Main Street, Suite 2104, Zelienople, PA 16063.  (Strategic Solutions and Strategic Services shall herein after be collectively referred to as "SSS").[2]

---

[1]  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Interim DIP Order.

[2]  SourceRight and Strategic Solutions have a common ownership and engage in the same line of business.

NYC/269552.9

23.     Defendant Robert Davenport ("Davenport") maintains an address, upon

information and belief, at 11812 San Vicente Blvd., Los Angeles, CA 90049 and was, at all

relevant times, the Chairman of the Board of Directors of Airway.  Davenport was, at all relevant

times, a managing director of Cerberus California, Inc.

24.     Defendant J. Richard Abraham ("Abraham") maintains an address, upon

information and belief, at 506 South Main Street Suite 2104 Zelienople, PA 16063 and was, at

all relevant times, a member of the Board of Directors of Airway.  Abraham was, at all relevant

times, the president of SSS, and holds some of Airway's indebtedness.

25.     Defendant Ray Wechsler ("Wechsler") maintains an address, upon information

and belief, at 11812 San Vicente Blvd., Los Angeles, CA 90049 and was, at all relevant times, a

member of the Board of Directors of Airway and a consultant to Cerberus.

26.     Defendant George Hamilton ("Hamilton") maintains an address, upon

information and belief, at 11812 San Vicente Blvd., Los Angeles, CA 90049 and was, at all

relevant times up to June 2004, a member of the Board of Directors of Airway, and was, at all

relevant times, a consultant to Cerberus.

27.     Defendant Steven Mayer ("Mayer") maintains an address, upon information and

belief, at 11812 San Vicente Blvd., Los Angeles, CA 90049 and was, at all relevant times up to

June 2004, a member of the Board of Directors of Airway.  Mayer was affiliated with Libra

Securities prior to becoming a consultant to Cerberus in or about 2002.

28.     Defendant John Dudash ("Dudash") last known address, upon information and

belief, is Airway Industries, Inc., 10th Street & Factory Avenue Ellwood City, PA 16117 and

was, at all relevant times up to June 2004, the President and Chief Executive Officer of Airway.

NYC/269552.9

29.     Defendant William Berry ("Berry") last known address, upon information and belief, is Airway Industries, Inc., 10th Street & Factory Avenue Ellwood City, PA 16117 and was, at all relevant times on or after June 2004, the President and Chief Executive Officer of Airway and a member of the Board of Directors of Airway.

30.     Defendant Grazyna Kurowska ("Kurowska") maintains an address, upon information and belief, at 122 Ridgemont Ct., Cranberry Twp, PA 16066-5406 and was, at all relevant times, a Vice President and Chief Financial Officer of Airway.

## Background

### The Debtor's Bankruptcy Filing

31.     Airway Industries, Inc. ("Debtor") is incorporated in the Commonwealth of Pennsylvania, and has its place of business at 10th Street & Factory Avenue, Ellwood City, PA 16117.  The Debtor did business as "Atlantic Luggage Company" and sold luggage products and travel accessories to department stores, specialty luggage stores and via other distribution channels in the U.S., Canada and China.

32.     Airway Industries, Inc. was also the direct or indirect owner of Austin House, Inc.,[3] (a New York corporation), Austin House Corp. (a Nova Scotia unlimited liability company), and Airway Austin House, Inc. (a Pennsylvania corporation).

33.     The Debtor owns a 50% interest in Strategic Sources Services, LLC.

34.     On January 20, 2006, ("Petition Date"), the Debtor filed its voluntary petition under the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Pennsylvania (Pittsburgh Division) ("Court").

---

[3] The Debtor's Schedules value the Austin House, Inc. stock at $2,500,000.

NYC/269552.9

35.     On January 26, 2006, the Court entered the *Interim Order (I) Authorizing (A) Debtor to Incur Postpetition Secured Debt, and (B) Use of Cash Collateral, (II) Granting Security Interests Pursuant to 11 U.S.C. §§ 105(a), 363(c), 364(c) and (d), and Bankruptcy Rules 2002, 4001 and 9014, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002, 4001 and 9014* (the "First Interim DIP Order").[4]

36.     The First Interim DIP Order granted the Committee time to file an action.

**Cerberus Takes Control of Airway Debt and Stock**

37.     Cerberus first acquired an interest in the Debtor in 1998 through a stock purchase agreement.  Cerberus now owns the Debtor's common stock, preferred stock and indebtedness. According to the Debtor's List of Equity Security Holders, Cerberus owns 42.43% of the Debtor's equity.

38.     Cerberus gained control of Airway through a series of transactions.  Cerberus made equity investments and acquired the Debtor's outstanding debt obligations.  The acquisition of the debt enabled it to exercise complete control over the Debtor.  Cerberus' debt acquisition was effectively an equity investment.

### *Cerberus' Prepetition Purchase of Loans of the Debtor*

39.     On or about July 9, 1998, the Debtor entered into a loan and security agreement (together with related documents, the "Prepetition Senior Loan Documents" with Fleet Capital Corporation (the "Fleet Debt" or "Original Senior Secured Lenders") for a senior loan facility of

---

[4]  On February 17, 2006, the Court entered the *Amendment to Interim Order (I) Authorizing (A) Debtor to Incur Postpetition Secured Debt, and (B) Use of Cash Collateral, (II) Granting Security Interests Pursuant to 11 U.S.C. §§ 105(a), 363(c), 364(c) and (d), and Bankruptcy Rules 2002, 4001 and 9014, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 2002, 4001 and 9014* (the "Second Interim DIP Order"), which modified certain superpriority claim and lien rights set forth in the First Interim DIP Order, including by reference to various representations and modifications set forth by the Cerberus Entities at the hearing on February 17, 2006.

8

up to $57 million consisting of a $35 million revolving credit loan and a $22 million term loan secured by all of the Debtor's assets.

40.     The proceeds of the loan were used as part of a plan to "recapitalize" Airway and enable Cerberus to takeover the Board.

41.     On or about December 17, 2001, an affiliate of Cerberus, Madeleine, L.L.C. ("Madeleine") purchased the claims of the Original Senior Secured Lenders and is the sole holder of claims against the Debtor arising under the Prepetition Senior Loan Documents. Cerberus acquired the Debtor's senior secured loan facility at a significant discount.

42.     Moreover, upon purchasing the senior secured loan facility, Cerberus caused the Debtor to pay a dividend to Cerberus on account of its equity interest in the approximate amount of $6,000,000.  Cerberus purportedly received this dividend in respect of its stock ownership and therefore, did not reduce the amount of its alleged secured indebtedness.

43.     As of the Petition Date, the Debtor asserts that the aggregate amount of all indebtedness owed by the Debtor under the Prepetition Senior Loan Documents totaled approximately $44,093,272.00 in principal and accrued interest plus accrued fees, costs and expenses.

### *Cerberus' Equity Investment*

44.     On July 15, 1998, Airway, the stockholders of Airway, and Airway Equity Partners, L.P. (a Cerberus affiliate) entered into a Stock Purchase and Recapitalization Agreement (the "Cerberus Stock Purchase Agreement").

45.     Under the terms of the Cerberus Stock Purchase Agreement, Cerberus received convertible preferred stock enabling Cerberus to appoint the Debtor's Board.

9

### *Prepetition Subordinated Loan Transactions*

46.     On or about November 10, 1999, the Debtor entered into a "subordinated loan agreement" for approximately $5,511,077 with Cerberus and various other lenders named therein.  These funds were used for "working capital".  The lenders, among whom Cerberus and other equity interest holders held the majority of the "debt", received "Warrants for Preferred Stock (Series A) and Common Stock".

47.     On or about September 28, 2000, the Debtor entered into a "senior subordinated loan agreement" for approximately $1,000,000 with Cerberus and various other lenders named therein.  The lenders, among whom Cerberus and other equity interest holders held the majority of the "debt", issued the loan which was "Convertible into Common Stock and Preferred Stock (Series A)".

48.     On or about May 22, 2001, the Debtor entered into a "secured senior subordinated loan agreement" (together with related documents, the "Prepetition Subordinated Loan Documents") with Cerberus and various other lenders named therein (the "Prepetition Subordinated Lenders" and with the Prepetition Senior Lenders, the "Prepetition Secured Lenders") providing for a loan in the amount of approximately $5,000,000 secured by all of the Debtor's assets.  In May 2001, Cerberus and the Debtor entered into a $5,000,000 subordinated secured loan facility in order to reduce the Fleet Debt and to pay past due interest.  The lenders, among whom Cerberus and other equity interest holders held the majority of the "debt", received "Warrants for Series B Convertible Preferred Stock".  The Debtor asserts that it presently owes $12,609,956 under that subordinated secured loan facility.

49.     As of the Petition Date, the Debtor asserts that the aggregate amount of all indebtedness owed by the Debtor under the Prepetition Subordinated Loan Documents totaled

approximately $12,609,956.00 in principal and accrued interest, plus fees, costs and expenses. However, these loans were really equity investments.

### *Prepetition CIT Factoring Agreement*

50.     On December 16, 2004, the Debtor entered into a factoring agreement (together with related documents, the "CIT Factoring Agreement") with CIT Group/CIT Commercial Services, Inc. ("CIT") pursuant to which the Debtor has factored its accounts receivable on a revolving basis.  Pursuant to the terms of the CIT Factoring Agreement, the Debtor asserts that it granted to CIT a security interest in certain of the Debtor's Accounts (as that term is defined in the CIT Factoring Agreement).

51.     As of the Petition Date, the Debtor asserts that the aggregate principal amount of all indebtedness owed by the Debtor under the CIT Factoring Agreement totaled approximately $1,800,000.00 plus accrued interest, fees and expenses.

### *Intercreditor Agreement*

52.     Purportedly by virtue of inter-creditor and subordination agreements between the Prepetition Senior Lenders, the Prepetition Subordinated Lenders and CIT, the Prepetition Secured Lenders agreed that CIT allegedly had a first priority security interest in certain accounts of the Debtor superior to all other security interests, including those of the Prepetition Senior Lenders and the Prepetition Subordinated Lenders and the Prepetition Secured Lenders' security interest is allegedly superior to the security interest of the Prepetition Subordinated Lenders.

### Cerberus Takes Control Of Airway's Directors and Officers

53.     Upon taking control of Airway in or about 1998, Cerberus took control of Airway's Board of Directors and Officers.

NYC/269552.9

54.    In or about 1998, Cerberus named Davenport, who was affiliated with Cerberus, as Chairman of the Board of Directors of Airway.

55.    In or about 1998, Cerberus named Wechsler, who was affiliated with Cerberus, as a member of the Board of Directors of Airway.

56.    In or about 1998, Cerberus named Hamilton, who was affiliated with Cerberus, as a member of the Board of Directors of Airway.

57.    From 1998 to the Petition Date, Cerberus continuously held at least three of the five seats on the Board of Directors of Airway.

58.    In or about 1998, Cerberus named Mayer, who was affiliated with Libra Securities,[5] as a member of the Board of Directors of Airway.  In or about 2002, Mayer joined Cerberus as a consultant.  From the time Mayer joined Cerberus, Cerberus held four of the five seats on the Board of Directors of Airway.

59.    In or about 2002, Cerberus replaced Abraham with Dudash as President and Chief Executive Officer of Airway.

60.    In or about June 2005, Cerberus replaced Dudash with Berry as President and Chief Executive Officer of Airway.

61.    In or about 2002, Cerberus installed Kurowska as an Officer of Airway.

**Fraudulent Conveyances to Airway Insiders**

62.    Airway conveyed more that $12 million to Cerberus (the "Cerberus Conveyances") and SSS (the "SSS Conveyances" and, together with the Cerberus Conveyances, the "Conveyances").  These transfers constitute fraudulent transfers under Pennsylvania law and the United States Bankruptcy Code.

---

[5]  Libra Securities had an interest in Cerberus' affiliate, Airway Equity Partners.

NYC/269552.9

63. Beginning in or about October 2002 through in or about August 2004, Airway conveyed at least $9.5 million to Cerberus.  Specifically, Airway made the following conveyances to Cerberus:

    (a)    $700,000 in October 2002;

    (b)    $1,200,000 in November 2002;

    (c)    $300,000 in December 2002;

    (d)    $250,000 in January 2003;

    (e)    $250,000 in February 2003;

    (f)    $1,400,000 in December 2003;

    (g)    $600,000 in January 2004;

    (h)    $300,000 in February 2004;

    (i)    $1,500,000 in April 2004;

    (j)    $1,800,000 in May 2004;

    (k)    $400,000 in June 2004;

    (l)    $500,000 in July 2004; and

    (m)    $300,000 in August 2004.

64. Beginning in or about November 2002 through the Petition Date, Airway conveyed at least $3,340,000 to SSS.  Specifically, Airway made the following conveyances to SSS:

    (a)    $400,000 in 2002;

    (b)    $1,100,000 in 2003; and

    (c)    $1,840,000 in 23 $80,000 monthly payments in 2002-04.

65. In sum, Airway transferred approximately $3,340,000 to SSS.

NYC/269552.9

66.    The Conveyances left Airway with insufficient cash and unreasonably small capital for Airway's ongoing financial needs.  Airway's debts to Cerberus and SSS were debts that the Defendants knew or should have known would be beyond Airway's ability to pay as such debts matured.

**Insufficient Efforts To Market Airway's Assets**

67.    In or about 2005, Cerberus decided to sell Airway's assets.  Cerberus directed its affiliated Directors to instruct Dudash to call Airway's competitors in the luggage industry and find out if any of these competitors were interested in purchasing Airway's assets.  The only director who was not a Cerberus consultant, Abraham, objected and disagreed with the plan to sell Airway's assets.  However, Abraham, through SSS and other ventures stood to lose his ongoing business relationship with Airway and potentially other Cerberus portfolio companies.

68.    Dudash called certain competitors of Airway and provided some financial information to some of the competitors.  Dudash informed the Board of Directors that Holiday Group Holdings Inc. ("Holiday") was interested in purchasing Airway's assets.[6]

69.    The Board of Directors authorized Dudash to negotiate with Holiday.  The Board of Directors authorized Berry, who succeeded Dudash as CEO of Airway in June 2005, to enter into a letter of intent with Holiday.

70.    From July 2005 to the Petition Date, Airway was bound by confidentiality and "no-shop" provisions that prevented Airway from marketing its assets to any entity other than Holiday-Travelpro.

71.    The Directors and Officers failed to take appropriate steps to market Airway's assets, including, but not limited to, the following:

---

[6] Holiday is related to Travelpro by virtue of their corporate parent, Borealis-Capital.

NYC/269552.9

(a)     Retaining an investment and merchant banking advisor;

(b)     Preparing a professional offering memorandum or similar document;

(c)     Exposing the offer of Airway's assets to potential buyers outside a small
group of luggage makers;

(d)     Hiring legal counsel experienced in assets sales;

(e)     Commissioning an appraisal of Airway's assets; and

(f)     Managing Airway's business to ensure that it remained in a positive
position through the sale process.

72.     These failures resulted in substantial harm to Airway's estate and its creditors.
Had Airway's Officers and Directors taken appropriate steps to market Airway's assets,
Airway's assets would have commanded a far higher price than the price negotiated with
Travelpro following one-on-one negotiations.

**Airway's Deepening Insolvency**

73.     Under the "balance sheet test" of solvency, the Debtor was insolvent on or before
December 31, 2000, when Airway had assets with a reported book value of $67.9 million and
reported liabilities of $71.9 million.  Furthermore, the overall "fair value" of the Debtor's assets
during this time period was less than the reported book value of those assets.

74.     Under the "equity test" for solvency, the Debtor was insolvent on or about
February 15, 2000, when the first quarterly interest payment was due on the Subordinated Debt
issued on November 10, 1999.  On information and belief, the Committee asserts that the Debtor
was unable to make these quarterly interest payments (and perhaps other debt obligations) as
they became due.

NYC/269552.9

75.     From the time that Airway became insolvent in or before 2000 to the Petition

Date, the Directors, Officers and Cerberus delayed filing an insolvency petition in order to

maximize Cerberus' position to the detriment of Airway's unsecured creditors.

76.     Improperly delaying the filing benefited Cerberus because Cerberus' alleged

secured liens rose to more than $70 million on the Petition Date.  Cerberus alleged that its

"Senior" lien was approximately $44 million, its "Subordinated" lien was approximately $13

million, and its super priority lien was $3 million, as of the Petition Date.  Meanwhile Airway

Directors, who were Cerberus appointees, permitted $9.5 million in payments and possible

dividends.

77.     While Cerberus served its own interest, the Directors and Officers also abandoned

their duty to Airway's creditors.  The Directors and Officers approved the filing of the Petition

only after prolonged negotiations with Travelpro.

78.     The Directors and Officers waited to file the Petition until less than 45 days

before a major luggage industry trade show.  By waiting, the Directors and Officers created an

"emergency" situation and left Airway with no alternative but to conclude a sale during a brief

period.

79.     Proper marketing of Airway's assets and timely filing of an insolvency petition

would have yielded far higher recovery for Airway's creditors.  In failing to act, Cerberus

defrauded the Debtor, the estate and the creditors.

**<u>Improper Bonus Agreements Between Officers and Cerberus</u>**

80.     In or about August 2005,  Cerberus entered into agreements (the "<u>Insider Bonus</u>

<u>Agreements</u>") to pay four of the Debtor's Officers insider bonuses totaling approximately

$1,200,000 (the "Insider Bonuses").[7]  Among these Officers are Berry, Kurowska and Miller

(collectively the "Insider Bonus Recipients").[8]

81.    The Insider Bonuses were designed so that, if the sale was completed and if

Cerberus received the proceeds thereof, the Insider Bonus Recipients would receive

approximately $1,140,000 from Cerberus.  In addition, Cerberus promised future employment to

each, at their current salary, but again only if Cerberus is paid from the sale proceeds.

82.    Upon information and belief, the Insider Bonus Agreements set forth payment of

the Insider of Bonuses, as follows:

(a)    William Berry, President, CEO and Secretary – $500,000;

(b)    Grace Kurowska, CFO – the greater of $300,000 and 4% of the net

proceeds of distributions to Cerberus from the Sale up to a maximum of $320,000; and

(c)    Brian Miller, VP – the greater of $300,000 and 4% of the net proceeds of

distributions to Cerberus from the Sale up to a maximum of $320,000.

83.    Moreover, in addition to the Insider Bonuses, Cerberus promised future

employment to each of the Insider Bonus Recipients at their current salaries, but again only if

Cerberus is paid from the sale proceeds.

84.    The Insider Bonuses gave financial incentives to the Insider Bonus Recipients to

seek benefits for Cerberus rather than Airway.  By entering into the Insider Bonuses, the

Insider Bonus Recipients divided their loyalty and agreed to serve the interest of Cerberus, not

Airway.

---

[7]  Previous filings by the Committee and the U.S. Trustee highlighted for the Court the existence of these Insider
Bonuses.  This Complaint cites the Insider Bonuses for the purpose of stating independent legal claims apart for the
prior motions determined by the Court.

[8]  Gerald Carr was initially identified as a potential Insider Bonus Recipient.  However, the plan to pay Mr. Carr was
revised upon objection by the Committee.

NYC/269552.9

85.    Based on the Debtor's filings, it appears that the Debtor and Cerberus have been developing a bankruptcy strategy since at least August 2005 and perhaps longer.  The long-term strategy is evidenced in the Supplement to the Sale Motion, as part of the proposed sale, the Debtor and Cerberus sought this Court's approval to pay four of the Debtor's key employees insider bonuses in violation of the United States Bankruptcy Code.

FIRST CLAIM FOR RELIEF
(Avoidance of Fraudulent Conveyances Pursuant to 12 Pa. C.S.A. § 5104(a))
(Against Cerberus)

86.    Plaintiff restates the allegations contained in paragraphs 1 through 83 as though fully set forth herein.

87.    Under 12 Pa. C.S.A. § 5104(a)(2), a transfer is avoidable if (i) such transfer was made or incurred on or within four years before the date of the filing of the petition, (ii) the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation, and (iii) one of the following two tests is satisfied:

(a)    the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(c)    the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts became due.

88.    Airway paid Cerberus at least $9.5 million within the four years before the Petition Date.

89.    Airway was insolvent at the time of the Cerberus Conveyances.

90.    The Cerberus Conveyances should be avoided as fraudulent conveyances pursuant to 12 Pa. C.S.A. § 5104(a).

18

91.     The value of the Cerberus Conveyances should be recovered and preserved for the benefit of Airway's estate and unsecured creditors.

<u>SECOND CLAIM FOR RELIEF</u>
(Avoidance of Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1))
(Against Cerberus)

92.     Plaintiff restates the allegations contained in paragraphs 1 through 90 as though fully set forth herein.

93.     Under § 548(a)(1)(B) of the Bankruptcy Code, a transfer is avoidable if (i) such transfer was made or incurred on or within two years before the date of the filing of the petition, (ii) the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation, and (iii) one of the following three tests is satisfied:

        (a)     the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

        (b)     the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

        (c)     the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

94.     Airway paid Cerberus at least $9.5 million within the four years before the Petition Date.  At least $5,400,000 was paid within two years before the Petition Date.

95.     Airway was insolvent at the time of the Cerberus Conveyances.

96.     The Cerberus Conveyances should be avoided as fraudulent transfers pursuant to § 548(a)(1)(B) of the Bankruptcy Code.

97.     The value of the Cerberus Conveyances should be recovered and preserved for the benefit of Airway's estate and unsecured creditors.

19

NYC/269552.9

## THIRD CLAIM FOR RELIEF
(Avoidance of Fraudulent Conveyances Pursuant to 12 Pa. C.S.A. § 5104(a))
(Against SSS)

98.     Plaintiff restates the allegations contained in paragraphs 1 through 96 as though

fully set forth herein.

99.     Under 12 Pa. C.S.A. § 5104(a)(2), a transfer is avoidable if (i) such transfer was

made or incurred on or within four years before the date of the filing of the petition, (ii) the

debtor received less than a reasonably equivalent value in exchange for such transfer or

obligation, and (iii) one of the following two tests is satisfied:

(a)     the debtor was engaged in business or a transaction, or was about to

engage in business or a transaction, for which any property remaining with the debtor was an

unreasonably small capital; or

(c)     the debtor intended to incur, or believed that the debtor would incur, debts

that would be beyond the debtor's ability to pay as such debts became due.

100.    Airway paid SSS at least $3,340,000 within the four years before the Petition

Date.

101.    Airway was insolvent at the time of the SSS Conveyances.

102.    The SSS Conveyances should be avoided as fraudulent conveyances pursuant to

12 Pa. C.S.A. § 5104(a).

103.    The value of the SSS Conveyances should be recovered and preserved for the

benefit of Airway's estate and unsecured creditors.

## FOURTH CLAIM FOR RELIEF
(Avoidance of Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1))
(Against SSS)

104.    Plaintiff restates the allegations contained in paragraphs 1 through 102 as though

fully set forth herein.

20

NYC/269552.9

105.     Under § 548(a)(1)(B) of the Bankruptcy Code, a transfer is avoidable if (i) such transfer was made or incurred on or within two years before the date of the filing of the petition, (ii) the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation, and (iii) one of the following three tests is satisfied:

(a)     the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(b)     the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(c)     the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

106.     Airway paid SSS at least $3,340,000 within the four years before the Petition Date.  Of that amount, at least $720,000 was paid within two years before the Petition Date.

107.     Airway was insolvent at the time of the SSS Conveyances.

108.     The SSS Conveyances should be avoided as fraudulent transfers pursuant to § 548(a)(1)(B) of the Bankruptcy Code.

109.     The value of the SSS Conveyances should be recovered and preserved for the benefit of Airway's estate and unsecured creditors.

FIFTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty)
(Against Directors, Officers and Cerberus)

110.     Plaintiff restates the allegations contained in paragraphs 1 through 108 as though fully set forth herein.

21

111.    At all relevant times, the Directors owed the strictest fiduciary duties to Airway, including duties of care, loyalty, honesty, and disclosure, and they were required to act in Airway's best interests, and not for the personal benefit of the Directors.

112.    At all relevant times, the Officers owed the strictest fiduciary duties to Airway, including duties of care, loyalty, honesty, and disclosure, and they were required to act in Airway's best interests, and not for the personal benefit of the Officers.

113.    At all relevant times, Cerberus owed the strictest fiduciary duties to Airway, including duties of care, loyalty, honesty, and disclosure, and they were required to act in Airway's best interests, and not for the personal benefit of Cerberus.

114.    Each of the Directors, Officers and Cerberus deliberately and in bad faith breached the fiduciary duties they owed to Airway by engaging in the conduct described above, including, but not limited to, the following:

(a)    authorization and approval of the Cerberus Conveyances and the SSS Conveyances;

(b)    the insufficient marketing of Airway's assets;

(c)    the improper Insider Bonuses with Airway Officers; and

(d)    the failure to seek bankruptcy protection at the appropriate time.

115.    The Directors, Officers and Cerberus breached their duty of due care by failing to act on an informed basis, failing to inform themselves of all material information reasonably available to them, and in acting with a reckless indifference and deliberate disregard of the interests of Airway and its creditors.

116.    The Directors, Officers and Cerberus breached their duties of good faith and loyalty by affirmatively acting to further the interests of Cerberus at the expense of Airway and

its creditors.  The Directors affiliated with Cerberus – Davenport, Hamilton, Wechsler, and Mayer – personally benefited by the Cerberus Conveyances.  By the transfer of the Cerberus Conveyances to Cerberus, Davenport received a personal benefit as a matter of law by virtue of Davenport's employment relationship with Cerberus.  By the transfer of the Cerberus Conveyances to Cerberus, Hamilton received a personal benefit as a matter of law by virtue of Hamilton's employment relationship with Cerberus.  By the transfer of the Cerberus Conveyances to Cerberus, Wechsler received a personal benefit as a matter of law by virtue of Wechsler's employment relationship with Cerberus.  By the transfer of the Cerberus Conveyances to Cerberus, Mayer received a personal benefit as a matter of law by virtue of Mayer's employment relationship with Cerberus.

117.    The Director affiliated with SSS – Abraham – personally benefited by SSS Conveyances.  By the transfer of the SSS Conveyances to SSS, Abraham received a personal benefit as a matter of law by virtue of his interest in and employment relationship with SSS.

118.    The Officers personally benefited by entering into agreements with Cerberus providing for the payment of improper Insider Bonuses, which provided that the Officers would benefit from an asset sale only if Cerberus actually received funds.  By entering into the Insider Bonus agreement with Cerberus, Berry received a personal benefit as a matter of law by virtue of the payment of $500,000 and the promise of future employment by Cerberus.  By entering into the Insider Bonus agreement with Cerberus, Kurowska received a personal benefit as a matter of law by virtue of the payment of $300,000 and the promise of future employment by Cerberus.

119.    The Directors, Officers and Cerberus acted knowingly and deliberately against the interests of Airway and its creditors.

23

120.    The violations by the Directors, Officers and Cerberus of their fiduciary duties were willful and knowing and made in bad faith.

121.    Airway and its creditors have been and are being further damaged by the foregoing breach of their fiduciary duties by the Directors, Officers and Cerberus.

122.    Because of the intentional nature of the wrongful conduct by the Directors, Officers and Cerberus, and the abuse of their positions of trust, the Plaintiff is entitled to punitive as well as compensatory damages in an amount to be proven at trial.

SIXTH CLAIM FOR RELIEF
(Aiding and Abetting Breach of Fiduciary Duty)
(Against Cerberus)

123.    Plaintiff restates the allegations contained in paragraphs 1 through 121 as though fully set forth herein.

124.    The Directors and Officers owed fiduciary duties to act with the utmost good faith, loyalty, fair dealing, and care toward Airway.

125.    As Airway approached insolvency in 2000, the Directors and Officers owed fiduciary duties to act with the utmost good faith, loyalty, fair dealing, and care toward Airway's creditors, including the duty to safeguard Airway's assets for the creditors' benefit.

126.    The Directors and Officers breached their fiduciary duties by (1) approving the Conveyances, (2) failing to take necessary and sufficient actions to market Airway's assets; (3) entering into improper Insider Bonuses with Airway Officers; and (4) delaying the filing of the bankruptcy petitions for the benefit of Cerberus and to the detriment of Airway's creditors.

127.    Cerberus aided and abetted these breaches by (1) knowingly taking actions to require and cause the Directors and Officers to make the Conveyances; (2) knowingly taking actions that caused the Directors and Officers to fail to take necessary and sufficient actions to market Airway's assets; (3) knowingly taking actions to require and cause the Directors and

NYC/269552.9

Officers to enter into improper Insider Bonuses for the benefit of Cerberus; and (4) knowingly

participating in delaying the filing of the bankruptcy petitions for the benefit of Cerberus and to

the detriment of Airway's creditors.

128.    Based on the foregoing, the Plaintiff is entitled to recover such money damages as

were caused by aiding and abetting of these breaches of fiduciary duty.

**SEVENTH CLAIM FOR RELIEF**
(Abuse of Control)
(Against Directors, Officers and Cerberus)

129.    Plaintiff restates the allegations contained in paragraphs 1 through 127 as though

fully set forth herein.

130.    Cerberus dominated and controlled the business affairs of Airway through

Cerberus' loans and stock ownership, and control of four of five seats on the Board of Directors.

In engaging in the conduct described herein, the Directors, Officers and Cerberus acted to further

their own private interests to the detriment of Airway and in abuse of the positions of control of

the Directors, Officers and Cerberus.

131.    The Directors, Officers and Cerberus breached and violated their fiduciary

obligations to Airway and its creditors, as described above.  Each of the Directors, Officers and

Cerberus knew or should have known that the acts and omissions of the other Directors, Officers

and Cerberus constituted a breach of fiduciary duty, corporate waste, and abuse of control.

132.    Each of the Directors, Officers and Cerberus knowingly gave substantial

assistance to the others in engaging in such conduct.  Without such substantial assistance and

encouragement, the wrongful acts could not have occurred.

133.    As a result of the wrongful conduct of the Directors, Officers and Cerberus,

Airway and its creditors suffered and continue to suffer economic losses and non-economic

losses, such as the loss of reputation and goodwill.  Airway also suffered other general and

25

specific damages including, but not limited to, lost profits, lost interest, and financial losses arising from corporate waste, all in an amount to be determined at trial.

EIGHTH CLAIM FOR RELIEF
(Deepening Insolvency)
(Against Directors, Officers and Cerberus)

134.    Plaintiff restates the allegations contained in paragraphs 1 through 132 as though fully set forth herein.

135.    The Directors, Officers and Cerberus artificially prolonged Airway's life in order to engage in a series of transactions design to benefit Directors, Officers and Cerberus at the expense of Airway.  The Directors, Officers and Cerberus fraudulently, improperly, and intentionally caused Airway to make the Conveyances at times that Airway was insolvent.  The Directors affiliated with Cerberus – Davenport, Hamilton, Wechsler, and Mayer – personally benefited by the Cerberus Conveyances.  The Director affiliated with SSS – Abraham – personally benefited by SSS Conveyances.  The Officers personally benefited by entering into Insider Bonuses providing that the Officers would benefit from an asset sale only if Cerberus actually received funds.  Cerberus further benefited at the other creditors' expense because Cerberus' lien positions increased substantially after the time that Airway became insolvent.

136.    The Directors, Officers and Cerberus were insiders, fiduciaries, and exclusive financial advisors.

137.    Placed in this position of trust and control, the Directors, Officers and Cerberus, with knowledge of the Debtor's state of financial affairs, misrepresented the Debtor's financial condition, causing the Debtor to make the Conveyances, engage in an ineffective effort to market the Debtor's assets, and fail to file a bankruptcy petition in a timely manner.

26

138.    The representations were made with the intent to induce the Debtor to make the Cerberus Conveyances and the SSS Conveyances, engage in an ineffective effort to market the Debtor's assets, and fail to file an insolvency petition in a timely manner.

139.    The Debtor necessarily and justifiably relied on the advice of the Directors, Officers and Cerberus.

140.    As a result, the Debtor, the estate and the Debtor's creditors were injured.

141.    This injury resulted from the deliberate inducement of the Debtors by the Directors, Officers and Cerberus, which inducement caused the Debtor to make the Conveyances, engage in an ineffective effort to market the Debtor's assets, and fail to file a bankruptcy petition in a timely manner.

142.    The Directors, Officers and Cerberus made such inducements for the purpose of enriching themselves at the expense of the Debtor.

143.    The Directors, Officers and Cerberus fraudulently expanded corporate debt and prolonged the Debtor's corporate life.

144.    Airway's Petition was not filed until January 20, 2006.

145.    Starting in or about 2000 and continuing until the Petition Date, the Directors, Officers and Cerberus caused Airway to delay filing a bankruptcy petition.

146.    Airway suffered injury from fraudulently extended life, dissipation of assets and insolvency.  As such, Airway's creditors lost substantial value that would have otherwise been available to satisfy their claims.

147.    Accordingly, Directors, Officers and Cerberus deepened the Debtor's insolvency and are liable for damages in an amount to be proven at trial.

NYC/269552.9

## NINTH CLAIM FOR RELIEF
(Equitable Subordination Pursuant to 11 U.S.C. § 510(c))
(Against Cerberus)

148.   Plaintiff restates the allegations contained in paragraphs 1 through 146 as though fully set forth herein.

149.   Based upon the foregoing, Cerberus engaged in inequitable, unconscionable, and unfair conduct.

150.   The inequitable, unconscionable, and unfair conduct of Cerberus resulted in harm to Airway and its creditors and/or gave Cerberus an unfair advantage over Airway's other creditors.

151.   Equitable subordination of all of the claims of Cerberus would be consistent with the provisions of the Bankruptcy Code.

152.   Equitable subordination of all of the claims of Cerberus is appropriate pursuant to 11 U.S.C. § 510.

153.   Cerberus' liens and security interests should be avoided, annulled, recovered, and preserved for the benefit of Airway's estate and Cerberus' claims should thus be subordinated to the claims of Airway's unsecured creditors.

## TENTH CLAIM FOR RELIEF
(Equitable Subordination Pursuant to 11 U.S.C. § 510(c))
(Against Abraham)

154.   Plaintiff restates the allegations contained in paragraphs 1 through 152 as though fully set forth herein.

155.   Based upon the foregoing, Abraham engaged in inequitable, unconscionable, and unfair conduct.

156.   The inequitable, unconscionable, and unfair conduct of Abraham resulted in harm to Airway and its creditors and/or gave Abraham an unfair advantage over Airway's other creditors.

157.   Equitable subordination of all of the claims of Abraham, if any, would be consistent with the provisions of the Bankruptcy Code.

158.   Equitable subordination of all of the claims of Abraham is appropriate pursuant to 11 U.S.C. § 510.

159.   Abraham's liens and security interests should be avoided, annulled, recovered, and preserved for the benefit of Airway's estate and Abraham's claims should thus be subordinated to the claims of Airway's unsecured creditors.

ELEVENTH CLAIM FOR RELIEF
(Equitable Subordination Pursuant to 11 U.S.C. § 510(c))
(Against SSS)

160.   Plaintiff restates the allegations contained in paragraphs 1 through 158 as though fully set forth herein.

161.   Based upon the foregoing, SSS engaged in inequitable, unconscionable, and unfair conduct.

162.   The inequitable, unconscionable, and unfair conduct of SSS resulted in harm to Airway and its creditors and/or gave SSS an unfair advantage over Airway's other creditors.

163.   Equitable subordination of all of the claims of SSS, if any, would be consistent with the provisions of the Bankruptcy Code.

164.   Equitable subordination of all of the claims of SSS is appropriate pursuant to 11 U.S.C. § 510.

165.    SSS's liens and security interests should be avoided, annulled, recovered, and preserved for the benefit of Airway's estate and SSS's claims should thus be subordinated to the claims of Airway's unsecured creditors.

## TWELFTH CLAIM FOR RELIEF
(Recharacterization)
(Against Cerberus and Abraham)

166.    Plaintiff restates the allegations contained in paragraphs 1 through 164 as though fully set forth herein.

167.    Courts have the authority to examine a transaction and determine from the evidence that a transaction denominated as a loan is properly characterized as a contribution to the borrower's equity.  The factors Courts consider in the recharacterization of debt to equity are present here.

168.    Cerberus and Abraham advanced monies to the Debtor when Cerberus and Abraham knew, or reasonably should have known, that the Debtor was in precarious financial circumstances, was insolvent, and was unlikely to generate sufficient liquidity to repay its loans.

169.    Advances by Cerberus and Abraham constituted risk investments in the Debtor's business in that Cerberus and Abraham knew, or reasonably should have known, when it made such advances that the Debtor could not obtain "conventional financing" from a disinterested lender and was unlikely to be repaid unless there was a substantial turnaround in the Debtor's business or would be repaid in the form of equity.

170.    Conduct by Cerberus and Abraham reveals that they did not intend the funds to be a loan and did not treat the transaction as a loan.  Cerberus and Abraham failed to act in a manner consistent with the interests of a lender.  Cerberus was an insider of the Debtor and controlled the Debtor's Board.

NYC/269552.9

171.    Since advances to the Debtors constituted a contribution of capital and risk

investment in the Debtor's business, the advances should be recharacterized as equity

contributions.

172.    Based upon the foregoing, and under the circumstances described above,

advances to the Debtor were nothing more than contributions to the Debtor's capital and not debt

transactions.

173.    As a result, purported debt claims of Cerberus and Abraham should be

recharacterized as equity claims.

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A.      On the First Claim for Relief, for damages in an amount to be determined after

trail;

B.      On the Second Claim for Relief, for damages in an amount to be determined after

trail;

C.      On the Third Claim for Relief, for damages in an amount to be determined after

trail;

D.      On the Fourth Claim for Relief, for damages in an amount to be determined after

trail;

E.      On the Fifth Claim for Relief, for damages in an amount to be determined after

trail;

F.      On the Sixth Claim for Relief, for damages in an amount to be determined after

trail;

G.      On the Seventh Claim for Relief, for damages in an amount to be determined after

trail;

NYC/269552.9

H.      On the Eighth Claim for Relief, for damages in an amount to be determined after

trail;

I.      On the Ninth Claim for Relief, for a judgment declaring that Cerberus' liens and

security interests shall be avoided, annulled, recovered, and preserved for the benefit of Airway's

estate and that Cerberus' claims shall be subordinated to the claims of Airway's unsecured

creditors;

J.      On the Tenth Claim for Relief, a judgment declaring that Abraham's liens and

security interests shall be avoided, annulled, recovered, and preserved for the benefit of Airway's

estate and that Abraham's claims shall be subordinated to the claims of Airway's unsecured

creditors;

K.      On the Eleventh Claim for Relief, a judgment declaring that SSS's liens and

security interests shall be avoided, annulled, recovered, and preserved for the benefit of Airway's

estate and that SSS's claims shall be subordinated to the claims of Airway's unsecured creditors;

L.      On the Twelfth Claim for Relief, for a judgment declaring that the claims of

Cerberus and Abraham shall be recharacterized as equity claims;

NYC/269552.9

M.      Granting pre- and post-judgment interest, attorneys' fees, costs and

disbursements, as applicable, together with such other and further relief as the Court deems just

and proper.

Dated:      New York, New York
            May 4, 2006

                                    Respectfully submitted,

                                    ARENT FOX PLLC

                                    By: */s/ George P. Angelich* _____
                                        George P. Angelich (PA I.D. No. 86623)
                                        Andrew I. Silfen
                                        Schuyler G. Carroll (pro hac vice)
                                        Robert M. Hirsh (pro hac vice)
                                        Michael S. Cryan (pro hac vice)
                                        1675 Broadway
                                        New York, New York 10019
                                        Telephone:    212-484-3900
                                        Facsimile:    212-484-3990

                                        Counsel for Official Committee of Unsecured
                                        Creditors of Airway Industries, Inc.

33